NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**ROBERT DOURANDISH,**

*Plaintiff-Appellant*

**v.**

**UNITED STATES,**

*Defendant-Appellee*

---

2015-5091

---

Appeal from the United States Court of Federal Claims in No. 1:14-cv-00937-CFL, Judge Charles F. Lettow.

---

Decided: October 20, 2015

---

ROBERT DOURANDISH, San Mateo, CA, pro se.

PAUL D. OLIVER, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant-appellee. Also represented by BENJAMIN C. MIZER, ROBERT E. KIRSCHMAN, JR., REGINALD T. BLADES, JR.

---

Before NEWMAN, CLEVENGER, and O'MALLEY, *Circuit Judges.*

CLEVENGER, *Circuit Judge.*

Pro se plaintiff Robert Dourandish is the co-owner of Quimba Software, Inc. ("Quimba"). This action arose out of a contract between Quimba and the Air Force Research Laboratory. The Court of Federal Claims dismissed Mr. Dourandish's complaint for lack of subject matter jurisdiction. A separate action before that court, between Quimba and the United States based on the same contract, is currently pending. *Quimba Software, Inc. v. United States*, No. 1:12-cv-00142-MCW (Fed. Cl. filed Mar. 1, 2012). For the reasons explained below, we *affirm.*

BACKGROUND

On July 10, 2003, Quimba entered into a cost-plus-fixed-fee contract with the Air Force Research Laboratory, number F30602-03-C-0185. Mr. Dourandish signed the contract for Quimba in his capacity as one of its executive officers, noting both the company's name and his title in his own handwriting.

The contract provided that Quimba would submit invoices for its costs to the Defense Contract Audit Agency ("DCAA"). The government would "make payments to [Quimba] when requested as work progresses . . . in amounts determined to be allowable by the Contracting Officer in accordance with Federal Acquisition Regulation (FAR) subpart 31.2 in effect on the date of this contract and the terms of this contract." Those payments would reimburse Quimba's "properly allocable and allowable indirect costs . . . ."

The following discussion is drawn from Mr. Dourandish's allegations. The contract was awarded to Quimba conditional on it bringing its accounting system into compliance with DCAA's requirements. Compl. ¶¶ 7, 8, 13. Quimba's co-owners began work on the contract in the

third quarter of 2003, but were told they would not be paid until Quimba's system complied with DCAA's standards and DCAA approved of Quimba's indirect rates. *Id.* ¶¶ 11, 14.

In February 2004, after Quimba improved its accounting system, DCAA approved a payment of $30,321.77. Quimba also initiated an audit of its indirect rates. During that audit, DCAA and Quimba disputed whether the deferred salaries Quimba sought to pay its co-owners were allowable under the FAR's cost-accounting standards. *Id.* ¶ 19. They worked to resolve the issue through multiple audits in 2004. *Id.* ¶¶ 20-41.

On November 24, 2004, DCAA approved Quimba's indirect rates, including its request for deferred compensation. *Id.* ¶ 42. Then, on January 26, 2005, DCAA sent Quimba a draft audit report that questioned whether the deferred compensation could be paid. *Id.* ¶ 47. At this point, Quimba had not yet been paid for salaries incurred during 2004, and DCAA initiated a Risk Review of the contract based in part on the fact that its founders were "not paying" themselves. *Id.* ¶¶ 48, 52.

Quimba completed its performance under the contract in March 2005. *Id.* ¶ 57. Following completion, it submitted invoices for all of its unpaid work and was paid. *Id.* ¶¶ 61–63. Then it submitted a rate proposal for all of its unpaid costs, including the deferred compensation. DCAA approved the proposal in June 2005, and Quimba was paid. *Id.* ¶¶ 65–66.

In May 2007, DCAA initiated an audit of Quimba's 2004 incurred cost proposal. *Id.* ¶ 67. The record shows that the Contracting Officer issued a Final Decision in March 2011, disallowing $149,085 in executive compensation costs Quimba incurred during fiscal year ("FY") 2004. Under the FAR provision in effect when the contract was formed, "[f]or closely held corporations, compensation costs covered by this subdivision shall not be recognized

in amounts exceeding those costs that are deductible as compensation under the Internal Revenue Code and regulations under it." FAR § 31.205-6(b)(2)(i) (2002). The Contracting Officer disallowed the compensation because he agreed with the DCAA auditor's report, which "questioned the proposed labor costs for the owners because they exceeded the actual labor costs paid and reported as compensation under IRS Regulations."

As a result, the government levied a debt of $91,992.77 against Quimba. Quimba challenged the debt in the Court of Federal Claims. *Quimba Software, Inc. v. United States*, No. 1:12-cv-00142-MCW (Fed. Cl. filed Mar. 1, 2012). That case remains pending, and we express no view on any aspect of that proceeding.

On October 3, 2014, Mr. Dourandish separately filed this action in the Court of Federal Claims. The first count of his complaint alleges that the government breached its contract with Quimba. The second count alleges that the government "violated Mr. Dourandish's rights, as guaranteed under the US Constitution and codified under the Civil Rights Act, by unjustly interfering with his ability to seek federal contracts."

Following the government's motion, the court dismissed for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). *Dourandish v. United States*, 120 Fed. Cl. 467 (2015). Mr. Dourandish appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

This court reviews de novo whether the Court of Federal Claims had jurisdiction. *Estes Express Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014). The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence. *Id.* When deciding a motion to dismiss for lack of subject matter jurisdiction,

we accept the complaint's uncontested factual allegations as true and construe them in the light most favorable to the plaintiff. *Id.*

The Tucker Act grants the Court of Federal Claims jurisdiction over claims for money damages against the United States that are "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2011). It is a purely jurisdictional statute that does not itself create any substantive rights. *See United States v. Testan*, 424 U.S. 392, 398 (1976). To invoke jurisdiction under the Tucker Act, a party must therefore identify a substantive right in another source of federal law that "can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained." *Id.* at 400 (quotation omitted); *see also United States v. Mitchell*, 463 U.S. 206, 217 (1983).

I

"To maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government . . . ." *Ransom v. United States*, 900 F.2d 242, 244 (Fed. Cir. 1990). That is, the plaintiff and the government must be in privity of contract. *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998). Either direct privity or status as a third-party beneficiary confers standing to sue the government. *See Anderson v. United States*, 344 F.3d 1343, 1352 (Fed. Cir. 2003).

"In order to prove third party beneficiary status, a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly." *Glass v. United States*, 258 F.3d 1349, 1354 (Fed. Cir. 2001), *opinion amended in other respects on reh'g*, 273

F.3d 1072 (Fed. Cir. 2001). "Specifically, in order to make a shareholder a third party beneficiary, the contract must express the intent of the promissor to benefit the shareholder personally, independently of his or her status as a shareholder." *Id.* at 1353–54.

Mr. Dourandish does not contend that there was a contract between himself and the government. Instead, he argues that he has standing to sue because he was an intended third-party beneficiary of the contract between Quimba and the Air Force Research Laboratory. The Court of Federal Claims found that Mr. Dourandish was at most an indirect beneficiary because the contract does not evidence any intent to benefit him personally. It therefore held that he lacked standing to sue.

On appeal, Mr. Dourandish argues that the contract evidences an intent to benefit him directly. Some of the evidence he identifies arose before the parties entered into the contract. He tells us that Quimba's proposal identified him by name as a Senior Investigator and included his salary as an expected cost, and also that before it awarded the contract the Air Force Research Laboratory asked him to provide documentation justifying his proposed hourly rate. The record does not contain the proposal or any documentation of pre-award discussions, and even if it were before us, the parol evidence rule would prevent it from changing the contract's terms. *See TEG-Paradigm Envtl., Inc. v. United States*, 465 F.3d 1329, 1338–39 (Fed. Cir. 2006). Regardless, this evidence would show at most that Mr. Dourandish was an employee of Quimba who was expected to perform work on the contract. It does not show intent to benefit him directly.

Within the contract itself, Mr. Dourandish relies on FAR § 52.232-09, which it incorporates. That provision limits the government's ability to withhold payments, but excludes withholdings related to wages or hours from its coverage. Mr. Dourandish asserts that this clause shows

the parties' intent to benefit him as an employee of Quimba. It appears unlikely that this provision benefits employees, but assuming that it does, nothing in its adoption indicates the parties' intent to benefit Mr. Dourandish directly.

Mr. Dourandish also points to the course of performance on the contract. He contends that, when DCAA repeatedly determined that it could not pay Mr. Dourandish's deferred salary, it demonstrated the parties' intent to benefit him. He also notes that the government initiated a risk audit of Quimba's contract on the basis that it was failing to pay its co-owners. Both are implausible; he was harmed, not helped, by DCAA's refusal to pay deferred salaries, and the risk audit was for the government's benefit. In any event, both happened after the contract was formed and is not evidence of the parties' intent at the time of formation.

None of this evidence evidence indicates an intent to benefit Mr. Dourandish personally, independent of his status as a shareholder. He has therefore not established that he was a third-party beneficiary to the contract between Quimba and the Air Force Research Laboratory.

Separate from his third party beneficiary argument, Mr. Dourandish presents three arguments as to why he has standing based on the contract between Quimba and the government.

First, he argues that he was the real party in interest in the contract between Quimba and the government. In support he cites Rule 17(a) of the Rules of the Court of Federal Claims, which provides in relevant part that "a party with whom or in whose name a contract has been made for another's benefit" may sue in its own name "without joining the person for whose benefit the action is brought." That rule governs the Court of Federal Claims' procedures and does not purport to set out when a party has standing. *See* Rules Ct. Fed. Cl. 1.

Second, Mr. Dourandish analogizes himself to a sub-contractor, where Quimba is the prime contractor. In general, subcontractors are not in privity with the government, but privity between the subcontractor and the government may exist if the prime contractor acted as an agent of the government when it entered into the subcontract. *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1550–51 (Fed. Cir. 1983). Mr. Dourandish gives us no reason to think that the same rule should apply here, where he was a co-owner of Quimba rather than a subcontractor. He also presents no argument as to why the criteria *Johnson Controls* sets out for subcontractor privity are met. *See id.* at 1551.

Third, Mr. Dourandish contends that he has standing as a creditor beneficiary. *See D & H Distrib. Co. v. United States*, 102 F.3d 542, 546–47 (Fed. Cir. 1996) ("In the case of a contract in which the promisee provides goods or services to the promisor, it has long been settled that a clause providing for the promisor to pay the proceeds of the contract to a third party is enforceable by the third party where the payment is intended to satisfy a present or future liability of the promisee to the third party."). That is not the case. No clause required Quimba to pay the proceeds of the contract to Mr. Dourandish. Further, there is no suggestion that any such payment would be intended to satisfy a debt of the government.

## II

Mr. Dourandish contends that the government violated his Fourteenth Amendment due process rights when it "knowingly refused to rescind an erroneous levy" by leaving the Contracting Officer's Final Decision in place after admitting that it contained an error.

The Court of Federal Claims dismissed this claim for lack of jurisdiction because the Fourteenth Amendment does not mandate the payment of money damages.

We affirm. "The law is well settled that the Due Process clauses of both the Fifth and Fourteenth Amendments do not mandate the payment of money and thus do not provide a cause of action under the Tucker Act." *Smith v. United States*, 709 F.3d 1114, 1116 (Fed. Cir. 2013) (citing *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995)).

## III

Mr. Dourandish argued below that the government violated his Fifth Amendment due process rights through an "illegal exaction." An illegal exaction claim arises when money is "improperly paid, exacted, or taken from the claimant [by the government] in contravention of the Constitution, a statute, or a regulation." *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005) (quoting *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967)).

Illegal exaction claims are an exception to the general rule that the Court of Federal Claims lacks jurisdiction over due process claims. That court has jurisdiction over illegal exaction claims "when the exaction is based on an asserted statutory power." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1573 (Fed. Cir. 1996). "To invoke Tucker Act jurisdiction over an illegal exaction claim, a claimant must demonstrate that the statute or provision causing the exaction itself provides, either expressly or by 'necessary implication,' that 'the remedy for its violation entails a return of money unlawfully exacted.'" *Norman*, 429 F.3d at 1096 (quoting *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1373 (Fed. Cir. 2000)).

The court dismissed Mr. Dourandish's illegal exaction claim for lack of jurisdiction, because his claims derive not from an "asserted statutory power" but from contract.

Mr. Dourandish did not appeal the dismissal of his Fifth Amendment due process claim. If he had, however,

we would affirm. Mr. Dourandish points to no statutory basis for his illegal exaction claim.

IV

Mr. Dourandish's complaint alleges that the government violated the Civil Rights Act by "unjustly interfering with his ability to seek federal contracts." Compl. ¶ 109.

The court dismissed this claim for lack of jurisdiction because, by statute, "[t]he district courts shall have original jurisdiction of any civil action . . . [t]o recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights . . . ." 28 U.S.C. § 1343(a)(4) (2011).

Mr. Dourandish also did not appeal the dismissal of his Civil Rights Act claim. If he had, we would affirm. Original jurisdiction over claims under the Civil Rights Act is vested in the district courts.

V

Finally, Mr. Dourandish argues that he has standing to sue on Quimba's contract with the government because Quimba is a closely held corporation and, as one of its co-owners, his interest overlap significantly with those of the company. In support, he points to *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014). He contends that case held that the owners of a closely held corporation are indistinguishable from the corporation itself, and therefore that they may sue on its contracts.

Mr. Dourandish's argument misreads *Hobby Lobby*. *Hobby Lobby* interpreted the Religious Freedom Restoration Act of 1993, 107 Stat. 1488, 42 U.S.C. § 2000bb *et seq.*, and held that regulations requiring closely held corporations to provide health insurance coverage for methods of contraception that violated the sincerely held religious beliefs of the corporations' owners violated that statute. *Hobby Lobby*, 134 S. Ct. at 2759. It has no bear-

ing on whether the co-owner of a closely held corporation has standing to sue on the corporation's contracts.

CONCLUSION

Accordingly, the Court of Federal Claims' dismissal of Mr. Dourandish's complaint for lack of jurisdiction is

**AFFIRMED.**

COSTS

No costs.